**Robert REICH, Secretary of Labor, United States Department of Labor, Plaintiff–Appellant,**

v.

**DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES, STATE OF ALABAMA, Defendant–Appellee.**

**No. 92–6978.**

United States Court of Appeals, Eleventh Circuit.

Aug. 1, 1994.

---

ter pursuant to 28 U.S.C. § 46(c).

Office of the Solicitor, U.S. Dept. of Labor, Lauriston H. Long, Birmingham, AL, for appellant.

Samuel D. Payne, William F. Gardner, E. Taylor Abbot, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL, and Otis J. Goodwyn, Asst. Atty. Gen., Montgomery, AL, for appellee.

Before TJOFLAT, Chief Judge, BIRCH, Circuit Judge, and HENDERSON, Senior Circuit Judge.

HENDERSON, Senior Circuit Judge:

The Secretary of Labor ("Secretary") appeals from the judgment of the United States District Court for the Middle District of Alabama finding in favor of the Alabama Department of Conservation and Natural Resources ("Department") in this action filed by the Secretary pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219. The issues on appeal are confined to whether the Department had actual or constructive knowledge of FLSA violations and, if so, whether the claims are subject to a two-year or a three-year statute of limitations. We affirm in part and reverse in part and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

The Secretary brought this action against the Department in August 1990, alleging infractions of the overtime and record-keeping provisions of the FLSA.[1] The suit sought backpay, liquidated damages and injunctive relief on behalf of 118 present and former conservation enforcement officers for the period of three years immediately preceding the filing of the cause of action.[2] The district court bifurcated the issues of liability and damages and, after a six-day bench trial on the question of liability, concluded that, although the Secretary proved a pattern of uncompensated overtime work by the officers during the 1987 through 1990 deer hunting seasons, for which no records were kept, the Department was not accountable because it had no actual or constructive knowledge of the overtime hours. Having so found, the court did not reach the issue of damages.

On appeal, the Secretary contends that the district court erred by finding that the Department had no constructive knowledge of the officers' overtime work. The Secretary also urges that the Department's violations were "willful" and that, consequently, the claims are subject to the three-year statute of limitations.

## II. THE DISTRICT COURT'S FINDINGS

The following facts found by the district court are not in dispute. The Law Enforcement Section of the Game and Fish Division of the Department is charged with enforcing the game and fish laws of the State of Alabama. It is divided into twelve districts, each with one captain, one lieutenant and a varying number of officers. The officers, who work independently out of their homes, are required to answer citizens' complaints referred to them at all hours of the day and

---

1. An employee's private right of action to seek backpay and liquidated damages under the FLSA terminates upon the filing of a complaint by the Secretary seeking injunctive relief pursuant to 29 U.S.C. § 217 (providing for the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due), or seeking legal or equitable relief in accordance with 29 U.S.C. § 215(a)(3) (proscribing the discharge of or discrimination against any employee because of the employee's involvement in an FLSA proceeding or service on an industry committee). *See* 29 U.S.C. § 216(b); *see also Castillo v. Givens*, 704 F.2d 181, 186 n. 11 (5th Cir.) (describing which FLSA causes of action

may be initiated by employees and which ones may be brought by the Secretary), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983).

2. The suit alleged violations dating back to March 1987. The Portal-to-Portal Act of 1947 provides that an action under the FLSA "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).

night. The number of these complaints increases during deer hunting season, when illegal night hunting becomes a substantial enforcement problem. The need to be responsive to public reports of hunting violations and to make "cases" or arrests has been consistently emphasized by the Department.

Because the officers work independently, the Department relies on their written reports to keep track of the number of their working hours. Every week each officer fills out a form on which he records the hours he spends on his enforcement duties (the "weekly report"), as well as an arrest report. These documents are mailed to the officer's district captain, who reviews them for completeness and accuracy, and then forwards them to the Department's Montgomery office for examination by the Department's chief. The officers have direct contact with their supervisors at monthly district meetings and occasionally work with their captains or lieutenants out in the field.

In 1975, the Alabama legislature enacted a law requiring the State to pay law enforcement officers one and one-half times their normal rate of pay for "[h]ours worked in excess of 40 in any calendar week."[3] *See* Ala.Code § 36–21–4. At that time, the Department formulated a policy which stated that employees in the classified service of the Department would not be assigned to more than forty hours of duty per week. According to James Goodwyn, Chief Legal Counsel for the Department, the purpose of this policy was to establish that, "as long as an officer was not *assigned* to work more than 40 hours a week, he was not compensated for overtime." (R7–972) (emphasis added). Charles Kelley, the Director of the Department's Game and Fish Division, became aware in 1982, however, that officers were working more than forty hours per week, particularly during hunting season. (*See* R6–754, 756–57). Officer Henry Lowry testified that, when he was hired in 1983, his captain informed him that during the hunting season the job could not be done in forty hours per week and required working from "can to can't."[4] (*See* R3–309–11). Nevertheless, the Department continued to maintain its position that overtime compensation could be legally avoided by limiting the officers' assignments to no more than forty hours per week, no matter how many hours they actually worked pursuing violators of state hunting laws.[5]

In 1983, Officer William Foley filed suit against the Department seeking unpaid overtime compensation pursuant to the Alabama overtime law. The Department denied that Foley had actually worked overtime hours, but eventually settled the case. As a result of this lawsuit, the Department began using a new weekly report form which advised that officers were not allowed to work more than forty hours per week, unless directed otherwise by the Commissioner, and which required the officers to certify an accounting of their activities and vehicle operation for the week. In addition, in 1985, in response to a Supreme Court decision which established the constitutionality of the extension of the federal wage and hour provisions to state employees, *see Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Department issued a memorandum to the effect that "it continues to be Departmental policy that law enforcement officers may only work 40 hours per week." (Defendant's Exh. 18). All the enforcement personnel were informed of this restriction in writing and their supervisors were instructed to monitor their hours close-

---

**3.** States, political subdivisions of states and interstate governmental agencies were not subject to the FLSA's minimum wage and overtime provisions prior to April 15, 1986. *See* Fair Labor Standards Amendments of 1985, Pub.L. No. 99–150, § 2(c)(1), 99 Stat. 787, 788–89; *see also Atlanta Professional Firefighters Union v. City of Atlanta,* 920 F.2d 800, 802 (11th Cir.1991).

**4.** Lowry explained that this meant "when you get up in the morning you can [work], and into the night, you're so tired you just can't, and you go to bed and get some sleep and in the morning you can again." (R3–310–11). He also testified he was told that officers who refused to work more than forty hours a week "usually [did not] last very long." (*Id.* at 310).

**5.** Section 36–21–4 specified that overtime compensation should be paid to those officers "assigned to duty for more than 40 hours during the calendar week." Ala.Code § 36–21–4. The Department's position may have been justified under this provision of the state law.

ly to insure compliance. District captains reiterated the policy often at the monthly district meetings. Officers were never told that they could or should violate the forty-hour policy. In spite of this strict admonition against overtime work, many of the Department's officers continued to work in excess of forty hours per week during the busy hunting seasons, without documenting the additional hours on their weekly reports. No officer was ever disciplined, however, for violating the forty-hour rule.

In 1987, the State commissioned a study of government operations, the Alabama Management Improvement Program ("AMIP"), in an effort to identify ways to reduce costs and increase efficiency. Persons from within and without the Department were selected to make up the AMIP study team, including Chief Counsel James Goodwyn as well as Assistant Director Sam Spencer and Lieutenant William Fuller,[6] both of the Game and Fish Division. Ann Lucas, an employee of the accounting firm of Ernst and Whinney, which conducted the study, was the team's facilitator. The group gathered information through employee interviews and confidential questionnaires. Lucas testified that the team was informed through the questionnaires that officers were working in excess of forty hours a week during hunting season in order to adequately perform their duties, and falsifying their weekly reports to conceal their overtime. The study team identified this as an issue to be addressed in their report on which they should make a recommendation.[7] The recommendation set forth in the team's "Final Draft Report" issued on August 7, 1987, stated:

### 1. RECOMMENDATION

Amend the forty hour work week for DCNR law enforcement officers to allow the first day of the week to begin on Friday and the last day of the week to end on Thursday.

Basis for Recommendation

6. By the time of trial, Fuller had been promoted to captain.

7. Lucas disclosed that matters selected for discussion in the report were prioritized by a vote of

- Presently Game and Fish officers cannot adequately perform the enforcement requirements as dictated by the demands of the public during the peak of hunting season because they are not allowed to work any overtime.... Officers are not presently allowed to work any overtime because there is no overtime money available and there is no alternative, such as compensatory time.

- *There appears to be some lack of control and supervision by district supervisors in monitoring the 40 hour work week.*

- The current work week begins on a Sunday and runs through Saturday. The Conservation enforcement job requires many more hours during the period of Friday through Sunday. Often officers have already expended the majority of their 40 hours prior to the latter part of the week. This leaves the officer with a minimum number of hours remaining to enforce laws on Friday and Saturday. Changing the first day of the work week to Friday should allow the officer to better manage the 40 hours he is required by law to work.

### 2. IMPACT

Cost of Implementation

- Should be no additional cost.

Benefits of Implementation

- Improve the efficiency of DCNR.

- Officers should be better able to manage their 40 hour work week. *This should result in less overtime worked and help prevent the falsification of reports.*

### 3. IMPLEMENTATION

Major Obstacles to Implementation

- Resistance from supervisors.

Principal Work Steps Required for Implementation

the team members and that all members had some input into the final recommendations, including those concerning the forty-hour work week. (*See* R3–189–91).

- Secure administrative/commissioner approval.
- *Require more effective management from the supervisor [sic] personnel to insure compliance with 40 hour work week.*

(Plaintiff's Exh. 173 at 80–81) (emphasis added). The cover letter accompanying the "Final Draft Report" discloses that it was sent to Governor Guy Hunt, and to the Department's Commissioner, Jim Martin. (*See id.* at inside front cover). In addition, according to AMIP policy, James Goodwyn, Sam Spencer, Assistant Commissioner Chester ("Corky") Pugh and Department Chief Dalton Halbrook were to receive copies of the "Final Draft Report."[8] The AMIP's "Final Report," which combined the recommendations made for all of the State operations studied, also recommended that the first day of the work week be changed to Friday to enable the officers to better manage their forty-hour work week.[9] (*See* Defendant's Exh. 22 at 45, Recommendation 220).

On the basis of this evidence, the district court found that, as of August 1987, the Department was aware of allegations that officers continued to work unreported overtime hours.[10] The court also determined that certain captains could have received actual notice of worked overtime hours during the 1987–88, 1988–89 and 1989–90 hunting seasons by comparing certain officers' arrest reports with their weekly reports, which revealed discrepancies such as arrests having been made on days when the officers reported no work at all, or during times on some days when there were no reported work hours. Given the volume of these reports and the relatively small number of those showing inconsistencies, the district court concluded it would not be reasonable to charge the Department with this knowledge.[11]

The district court found it significant that, after the summer of 1987, all supervisors continued to repeatedly inform the officers that they could not work more than forty hours per week. Also, officers were instructed to call the central office to report calls they could not answer because of the work week limitation, or to refer these calls to other officers. They were also urged to complete their tasks by working their "best 40," that is, by managing their time better. (R1–22–22). Eleven officers claimed that they were able to perform their duties in forty hours.[12] The district court concluded that, in the face of the Department's stated policy concerning the forty-hour work week and the evidence that some officers were able to comply, the Department had no constructive knowledge of the pattern of overtime hours employed by the other officers during the period of time relevant to the case.

## III. ACTUAL OR CONSTRUCTIVE KNOWLEDGE

### A. *The governing law*

The FLSA mandates that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours ... specified at a rate not less than one and one-half

---

8. Goodwyn testified that he received his copy of the report. Spencer said he never saw it, and Halbrook remembered that the AMIP sent him "something" after the completion of the study.

9. Chief Counsel Goodwyn testified that, under Ala.Code. § 36–21–4, the Department was required to treat Sunday as the first day of the work week. He recommended, therefore, that the statute be amended to accomplish this proposed goal. (R7–984–85).

10. The district court also noted "[t]here was evidence that at least one district supervisor, who retired in late 1987, told his officers to get their work done but not to report over 40 hours a week." (R1–22–20).

11. The officers' arrest reports and weekly reports were sometimes received by the captains together, but not always. The captains who testified stated that, because of time constraints, particularly during hunting season, they made only cursory reviews of these reports and did not compare them for consistency. Instead, they relied on the honesty of their officers in reporting time worked. Out of approximately 19,000 reports submitted during the relevant time frame, about thirty-five reports showed inconsistencies.

12. On the other hand, twenty-three officers testified that they generally needed to work more than forty hours to adequately fulfill the needs of the job.

times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The term "employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(g). The regulations caution that "[w]ork not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. The reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted. *Id.*

> In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13.

■■■ This court's predecessor recognized that "an employer's knowledge is measured in accordance with his 'duty ... to inquire into the conditions prevailing in his business.'" *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 512 (5th Cir.1969)[13] (quoting *People ex rel. Price v. Sheffield Farms–Slawson–Decker Co.,* 225 N.Y. 25, 121 N.E. 474, 476 (1918)). An employer "'does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates.... The cases must be rare where prohibited work can be done ... and knowledge or the consequences of knowledge avoided.'" *Id.* (quoting *People ex rel. Price,* 121 N.E. at 476). In reviewing the extent of an employer's awareness, a court "need only inquire whether the *circumstances* ... were such that the employer either had knowledge [of overtime hours being worked] or else had 'the opportunity through reasonable diligence to acquire knowledge.'" *Id.* (quoting *People ex rel. Price,* 121 N.E. at 476).

## B. *The standard of review*

The Secretary urges us to review *de novo* the district court's finding that the Depart-

ment had no actual or constructive knowledge of the uncompensated overtime. The Department contends that this is a finding of fact which we should uphold unless clearly erroneous.

The parties have not cited, and we have been unable to find, any decisions from this circuit which discuss the appropriate standard for reviewing a district court's determination as to whether an employer knew or should have known of overtime violations. The Department relies upon *Davis v. Food Lion,* 792 F.2d 1274 (4th Cir.1986), in which the United States Court of Appeals for the Fourth Circuit treated the issue as one of fact. *See id.* at 1277. This court has construed the question of actual or constructive knowledge as an issue of fact to be reviewed for clear error in other contexts. *See, e.g., Lewis v. Federal Prison Indus., Inc.,* 786 F.2d 1537, 1543–45 (11th Cir.1986) (reversing as clearly erroneous a district court's finding with respect to whether management knew or should have known that remedial action taken to eliminate age discrimination was ineffective).

■■■ Under the Federal Rules of Civil Procedure, a district court's findings of fact "shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a). "A finding of fact is clearly erroneous 'if the record lacks substantial evidence to support it,' so that our review of the entire record leaves us 'with the definite and firm conviction that a mistake has been committed.'" *Atlanta Athletic Club v. Commissioner,* 980 F.2d 1409, 1411–12 (11th Cir.1993) (quoting *Thelma C. Raley, Inc. v. Kleppe,* 867 F.2d 1326, 1328 (11th Cir.1989), and *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). Notwithstanding Rule 52(a), an appellate court has

---

**13.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of the former Fifth Circuit Court of Appeals rendered before October 1, 1981.

the power to reverse a district court's factual conclusion when it is predicated upon a misapprehension of the governing rule of law. *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739, 744–45 (1986); *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502, 517 (1984); *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 79 (1982). Our review of the district court's application of the law to the facts is *de novo. Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.,* 3 F.3d 1472, 1475 (11th Cir.1993).

## C. Analysis

■ Although the issue of actual or constructive knowledge of overtime violations can be described as one of ultimate fact subject to the clearly erroneous standard of review, *see Bose Corp.,* 466 U.S. at 501, 104 S.Ct. at 1959–60, 80 L.Ed.2d at 517, we find that, in arriving at its conclusion in this case, the district court misapplied the law.

The district court rested its finding that the Department could not be charged with knowledge of the overtime violations primarily upon the fact that supervisors repeatedly told the officers that overtime hours were prohibited. However, "[t]he mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so." 29 C.F.R. § 785.13. There is no indication in the record that the Department did anything at any time relevant to this litigation to discourage the overtime required by the vast majority of its officers to properly perform their duties other than to promulgate its policy against such work and to urge the officers to "work their best 40." For example, no officer was ever disciplined for violating the forty-hour rule.

If from no other source, the Department had actual knowledge through the 1987 AMIP study that unreported overtime during deer hunting season continued to be a substantial problem despite the Department's 1985 written policy prohibiting all such work. The study also revealed that supervisory personnel had failed to fulfill the 1985 directive to monitor the officers' hours closely to insure compliance. The district court found that the hunting activity that traditionally caused deer season to be such a busy period of time continued after 1985, and that there was no fundamental change at any pertinent point in the amount of work to be performed by the officers. Complaints about the forty-hour rule were common and the subject came up frequently during the district meetings.

In the face of the continued peak activity during deer hunting season and its specific knowledge that the 1985 policy against overtime was not being followed, the Department had a duty to do more than to simply continue to apprise the officers of the policy. The Department had an obligation to "exercise its control and see that the work [was] not performed if it [did] not want it to be performed." 29 C.F.R. § 785.13. The fact that some officers were able to comply with the forty-hour rule did not relieve the Department of its responsibility to ensure that the remaining officers did not violate the rule. We therefore conclude that the district court erred as a matter of law by finding that the promulgation of the forty-hour policy, coupled with the ability of some officers to comply, insulated the Department from liability.

■ In addition, the district court erred as a matter of law by failing to impute to the Department knowledge of the inconsistencies contained in the weekly and arrest reports, which revealed that certain officers were not reporting the total number of hours they actually worked during the 1987–88, 1988–89 and 1989–90 hunting seasons. The fact that the captains made only cursory examinations of these reports because of their own lack of time for review does not excuse them from being charged with constructive notice of the information contained in the documents. As noted earlier, an employer is not relieved of the duty to inquire into the conditions prevailing in his business " 'because the extent of the business may preclude his personal supervision, and compel reliance on subordinates.' " *Gulf King Shrimp. Co.,* 407 F.2d at 512 (quoting *People ex rel. Price,* 121 N.E. at 474). This is especially so where, as here, the Department specifically instructed its supervisors to closely monitor the officers'

hours to ensure compliance with the 1985 policy and knew, through the 1987 AMIP study, that such monitoring was not being accomplished.

This factual situation is comparable to that of another case, *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973), in which the former Fifth Circuit Court of Appeals held that the employer had constructive knowledge of unreported overtime. *See id.* at 828. As in this instance, the employees in *Brennan* were required by the nature of their jobs to work long and irregular hours in the field. Because they worked independently, their employer relied upon them to accurately report their hours. Upper management encouraged accurate overtime reporting, but the employees understated their hours due to pressure brought to bear by their immediate supervisors. The court held that an employer exercising reasonable diligence would have gained knowledge of this fact. *Id.* at 827.

We hold that, under the circumstances of this case, the Department was required to do more than to simply periodically issue admonishments to avoid liability under the FLSA. As in *Brennan*, the Department could have acquired actual knowledge of the continuing overtime problem through the exercise of reasonable diligence. Accordingly, the case must be remanded for further proceedings on the issue of damages.

## IV. THE STATUTE OF LIMITATIONS

■ The district court went further and found that any infractions of the FLSA committed by the Department were not willful and thereby triggered the imposition of a two-year statute of limitations. *See* 29 U.S.C. § 255(a). In *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the Supreme Court defined willful violations as those where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 133, 108 S.Ct. at 1681, 100 L.Ed.2d at 123. We review the district court's finding on this issue under the clearly erroneous standard. *See Formby v. Farmers & Merchants Bank,* 904 F.2d 627, 632 (11th Cir.1990).

■ The district court found that the Department's approach to unauthorized overtime changed from a pattern of acquiescence evident in 1985 to a more vigilant attitude toward its proscription in 1987. Although the Department should have done more to ameliorate the problem, it did at least attempt to address it, albeit ineffectively. We cannot say on the basis of the record before us that it showed reckless disregard for the matter of whether its conduct was prohibited. Its failure to rectify this troublesome situation can better be described as resulting from negligence rather than from willfulness. *See McLaughlin,* 486 U.S. at 133, 108 S.Ct. at 1681, 100 L.Ed.2d at 123 (the term "willful" is generally understood to refer to conduct that is not merely negligent). We, therefore, affirm as not clearly erroneous the district court's determination that the two-year statute of limitations governs these claims.

AFFIRMED in part and REVERSED and REMANDED in part.